**Guy John BOYER, Petitioner,**

v.

**Thomas R. ISRAEL, Respondent.**

No. 80–C–780.

United States District Court,
E. D. Wisconsin.

June 15, 1981.

**1370**

Guy John Boyer, pro se.

Bronson C. LaFollette, Wis. Atty. Gen., by Pamela Magee-Heilprin, Asst. Atty. Gen., Madison, Wis., for respondent.

### DECISION and ORDER

MYRON L. GORDON, District Judge.

In his petition for a writ of habeas corpus, Mr. Boyer attacks his conviction for first degree murder on the grounds that the state trial court instructed the jury that it could presume the essential element of intent from the petitioner's acts. A jury instruction involving such a presumption was found to be unconstitutional in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

The respondents raise several arguments to support the conviction, including the pe-

titioner's failure to exhaust state remedies and his failure to object contemporaneously with the challenged instruction. The respondents further argue on the merits that *Sandstrom* does not mandate the granting of the writ under the circumstances of this case.

### I. FACTUAL BACKGROUND

The factual background was set out in detail by the Wisconsin supreme court. *Boyer v. State*, 91 Wis.2d 647, 284 N.W.2d 30 (1979). Only the elements that pertain to the issues at bar will be alluded to here.

On October 16, 1974, the petitioner spent much of the day drinking and playing pool in several taverns. At about 10:30 P.M. he returned home and told his wife that he was going to visit Verona's Tap to get some money. Verona's Tap was not in operation as a tavern; it was owned by Verona Blessinger, a seventy-three year old woman who lived there. It was rumored in the neighborhood that Mrs. Blessinger kept money lying about the premises.

The petitioner's wife joined him, and they drove the few blocks to the tavern, stopping first for a drink at another bar. When they arrived at Verona's, the petitioner and his wife entered through the rear door. The petitioner was carrying a flashlight. They went into the living room and discovered Mrs. Blessinger on a couch. Mr. Boyer shined the light in Mrs. Blessinger's face and asked her for her money. When she did not respond, the petitioner's wife testified that he hit the victim in the face with the flashlight.

The petitioner instructed his wife to search for the victim's purse and then told her to help him with Mrs. Blessinger. He told her to tie the victim's legs together with some cloth. Meanwhile, the victim was moving and groaning. Mrs. Boyer testified that the petitioner lifted his foot and stamped on the victim's chest. The victim made a gurgling noise; when Mrs. Boyer asked what the noise was, the petitioner responded: "She's dying." The petitioner's wife then suggested that they make an

anonymous call for an ambulance, but the petitioner told her it would not make any difference.

Mrs. Boyer then went back to the car, where the petitioner soon joined her. He was carrying a box filled with small liquor bottles. They then visited several other taverns, and at one of them sold the box of liquor. Subsequently, he purchased some gasoline at an all-night gas station. He and his wife returned to Verona's Tap, and the petitioner went into the tavern. He emerged shortly thereafter, laid a trail of gasoline from the tavern into the yard, and lit the gasoline on fire. He then rejoined his wife in the car, telling her that Mrs. Blessinger was dead and that he had thrown gasoline around the tavern's living quarters.

However, the tavern did not burn that night, and the next day Mrs. Blessinger's body was found. Her autopsy revealed that she had numerous bruises and lacerations on her face and head. Her nose, upper jawbone, cheekbone, and right collarbone were broken, as were eight ribs on either side of her chest, some in more than one place. The examining physician testified that the head injuries were caused by multiple blows with a blunt object. He also testified that stomping on the victim's chest could have caused the rib fractures. He further testified that two of the blows were of sufficient severity that either could have caused Mrs. Blessinger's death, but it was his opinion that the two blows had acted in combination to do so.

Mr. Boyer was not suspected of this crime at first; another individual was investigated and in fact charged. Some months later, investigating police officers interviewed Mr. Boyer at the Wisconsin correctional institution at Waupun, where he was incarcerated on another charge. At that interview, the petitioner admitted having a part in the crime. Subsequently, he spoke with an assistant district attorney by phone and made several incriminating statements which were recorded. The taped conversation and the petitioner's statements were received in evidence at trial. The petition-

er's wife also testified for the state. The petitioner took the stand in his own behalf.

The jury found the petitioner guilty of all counts: first degree murder, armed burglary, and attempted arson. The trial judge sentenced Mr. Boyer to life imprisonment on the murder charge and imposed consecutive terms totaling thirty years on the other charges. The petitioner is presently incarcerated at Waupun.

The petitioner alleges in his petition that he brought a motion for post-conviction relief before the trial court, claiming that his rights to a fair trial and due process of law were violated through the use of the instruction challenged here. He further states that on July 17, 1980, the trial court denied his motion, relying on *Muller v. State*, 94 Wis.2d 450, 289 N.W.2d 570 (1980), which upheld the constitutionality of the challenged instruction.

## II. EXHAUSTION OF REMEDIES AND CONTEMPORANEOUS OBJECTION

Before I reach the merits of the petition, I must address certain preliminary questions raised by the respondents. They contend that the petitioner has failed to exhaust his state remedies. The argument has two parts.

They first contend that the petitioner has not yet adequately demonstrated that he has actually moved for post-conviction relief because this motion and order were not attached to the petitioner's petition. The standard form for habeas petitions requires a petitioner to delineate, in a sworn statement, his efforts to exhaust his state remedies. The form does not require the attachment of each motion or order relating to these efforts. The state's response to the petition contained only a general denial of much of Mr. Boyer's petition, including the section on exhaustion. Now the respondents argue that there is not sufficient evidence of exhaustion.

The respondents do not argue that the petitioner failed to move for post-conviction relief, something respondents' counsel is in a position to know. Instead they

argue that the petitioner has not satisfactorily demonstrated exhaustion. The unsupported contention that a petitioner must attach the relevant papers to his petition is totally without merit. If there are problems with Mr. Boyer's averments regarding exhaustion, the respondents must answer with a specific denial and argue their position with specificity. They have not done so; accordingly, I reject their contention that the petitioner has not adequately demonstrated his efforts to exhaust his state remedies.

■ The respondents' second argument is that if the petitioner did bring a post-conviction motion which was denied, then he has failed to exhaust his state remedies because he has not appealed that denial. The petitioner points out that he did not appeal because the trial court relied on *Muller, supra*. I have previously considered this issue in *Ross v. Israel*, 503 F.Supp. 131, 132–33 (E.D.Wis.1980), where I held that further appeal of a denial based upon *Muller* would be futile. The *Ross* analysis is applicable here; accordingly, I find that it would have been a futile gesture for Mr. Boyer to appeal the trial court's denial of his post-conviction motion.

■ The respondents also argue that Mr. Boyer's failure at trial to object to the court's instruction bars the instant collateral attack on his conviction. *Ross* also considered and rejected this argument, because the trial court did not rely on this rule when rejecting the petitioner's motion for post-conviction relief, but reached the merits of the issue. The situation is the same here.

In addition, Judge Terence Evans considered the same argument in a substantially similar situation and found that because intent was an issue at trial the petitioner could not be deemed to have made an intelligent waiver of his objection to the instruction. *Pigee v. Israel*, 503 F.Supp. 1170, 1172 (E.D.Wis.1980) (*Pigee I*); *aff'd upon reconsideration, Pigee v. Israel*, No. 80–C–704 (E.D.Wis., filed February 3, 1981); *see Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). For this reason, and the reasons stated in *Ross*, I reject the respondents' argument.

## III. THE MERITS OF THE PETITION

■ The petitioner bases his case on a portion of the Wisconsin Jury Instruction—Criminal 1100 (the "Wisconsin instruction") which was used in his case. This is the standard jury instruction that has been used in first degree murder trials in Wisconsin. The crucial language reads:

> "When there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all of the natural, probable and usual consequences of his deliberate acts. If one person assaults another violently with a dangerous weapon likely to kill and the person thus assaulted dies therefrom, then when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended." Transcript of the instructions, p. 5.

I have previously found the above instruction to be unconstitutional. *Austin v. Israel*, 516 F.Supp. 461 (E.D.Wis., 1981); *accord, Harris v. Israel*, 515 F.Supp. 568 (E.D.Wis., 1981) (Reynolds, C. J.); *see Muller v. Israel*, 510 F.Supp. 730 (E.D.1981) (Warren, J.); *but see Pigee I, supra, Muller, supra*. As I stated in *Austin*:

> "I am satisfied that there is no valid basis for distinguishing the [Wisconsin] instruction ... from the instruction found unconstitutional in *Sandstrom*. The interpretation of the instruction urged by the respondent is not an unreasonable one. Based upon the breadth of the instruction, the lack of any qualifying phrases to guide the jury and preclude an unconstitutional application, and the close similarity between the instruction at bar and the *Sandstrom* instruction, I find that reasonable jurors could easily have expected that it was the burden of the petitioner to persuade them that he did not intend to kill." *Id.*, at 467. (citation omitted).

The respondents contend that even if the instruction at bar is unconstitutional, Mr.

Boyer's petition should be denied because: (1) *Sandstrom* should not be applied retroactively, and (2) the error in giving the instruction was harmless beyond a reasonable doubt. I considered the matter of retroactivity in *Austin* and determined that *Sandstrom* must be applied retroactively. *Austin, supra,* at 467–68. Accordingly, I reject the respondents' first ground. Thus only the issue of harmless error remains.

At Mr. Boyer's trial, two witnesses—Mr. Boyer and his wife—described the events at Verona's Tap the night Mrs. Blessinger died. Mrs. Boyer testified in the manner stated by the Wisconsin supreme court and summarized above. Mr. Boyer's testimony differed markedly from that of his wife.

Mr. Boyer testified that he was an alcoholic and that he had been drinking heavily on the day of Mrs. Blessinger's death. He testified that because of the alcohol he had only a faint memory of his actions that day. Trial transcript, p. 347. As a result of this testimony, the trial judge instructed the jury on the defense of intoxication.

The petitioner also testified that when he entered the tavern and asked the victim for her money, she came at him and struggled with him. He testified: "I took the flashlight and I warded her hands off with it in a front forward motion." Trial transcript, p. 369. He then testified that he grabbed both her arms and "tried to put her on the floor." Trial transcript, p. 369. The testimony continued:

"Q Then what happened?

"A I pulled her around to put her on the floor and as I was doing this, she went down and she held onto me and I fell on her.

"Q You did fall on her? Did you do that intentionally?

"A No sir." Trial transcript, pp. 369–70.

Mr. Boyer then testified that he got up with his wife's help and began to search for Mrs. Blessinger's money, leaving her lying on the floor, moaning. He stated that his wife tied Mrs. Blessinger's feet together without him telling her to do so. Subsequently, he told his wife to help him put Mrs. Blessinger on the couch. His testimony continued:

"While we were talking about her helping me pick Verona up, Verona had tried to lift herself up on her left elbow. My wife took her right foot and kicked Verona very hard in the side of the head." Trial transcript, p. 374.

Mr. Boyer then testified that he and his wife left the tavern and went to several other bars and also to a gasoline station, where he bought some gasoline. They returned to Verona's Tap, and Mr. Boyer went in. He testified that Mrs. Blessinger was on the couch, moaning. Mr. Boyer stated that he told the victim that he was sorry for what had happened. He then went into the yard and poured some gasoline on the ground, because he "wanted to get someone to see a fire, to alert possibly the police or the Fire Department." Trial transcript, p. 381.

Mr. Boyer also testified:

"Q You've always maintained, however, in your statements that you were drunk at the time that this instant [sic] occurred?

"A That is correct." Trial transcript, p. 390.

Mr. Boyer's testimony conflicts with that of his wife in most, if not all, of the significant details. In essence, the jury was presented with two sharply divergent stories. Thus the issue at trial was less the question of Mr. Boyer's intent than a dispute over whether Mr. Boyer's version of what happened was more credible than that of his wife.

In *Austin*, I noted the difficulty of ruling that the error in giving the Wisconsin instruction was harmless beyond a reasonable doubt if intent was the major issue at trial. *E. g. Ross v. Israel, supra,* (where the central issue was identification), and the cases cited therein. However, I also reasoned that "it may be appropriate to find harmless error if there is strong evidence of intent, and the only evidence to the contrary is the defendant's own incredible as-

sertions of a lack of intent." *Austin, supra,* at 468, *citing United States v. Bohlmann,* 625 F.2d 751, 753 (6th Cir. 1980) (per curiam).

I believe the use of the invalid Wisconsin instruction does not require issuance of the writ either (1) if intent was not the central issue at trial, or (2) if intent was the issue but there is nevertheless strong evidence of intent contradicted only by the defendant's incredible assertions to the contrary. In the instant case, I find that under both of these tests for the application of harmless error, the writ should not be issued.

First, the coroner's report leaves little doubt that someone—the petitioner, his wife, or someone else—attacked and beat Mrs. Blessinger with the intent to kill. What the jury had before it was a testimonial conflict between the petitioner and his wife. The invalid Wisconsin instruction could have played no role in the jury's resolution of this credibility issue. *See Genova v. Buehler,* 80–C–802 (E.D.Wis., filed March 4, 1981).

Second, the only evidence of a lack of intent consists of the petitioner's own testimony, which is riddled with inconsistencies and not supported by certain physical evidence presented at trial. Mr. Boyer testified that he struggled with Mrs. Blessinger, a 73 year old woman and then fell on her. He also stated that his wife kicked Mrs. Blessinger in the side of the head. This description of how Mrs. Blessinger suffered her fatal injuries does not square with the autopsy report summarized above. The victim suffered several fractures about the face; the examining physician testified that the flashlight Mr. Boyer carried was a blunt object that could have caused those injuries. Trial transcript, p. 167.

Mr. Boyer also testified that he poured gasoline in one spot on the lawn and lit it on fire to draw attention to the tavern. He specifically denied spilling any gas near the house. However, a policeman who examined the yard testified that the lawn was burned in a trough-like pattern, in a regular, straight line less than twelve inches wide. A photograph of the burn marks was also introduced. Trial transcript, pp. 190–91. This burn pattern is not consistent with Mr. Boyer's testimony; these and other statements regarding the gasoline do not ring true.

Assessing the record as a whole, I find serious flaws in Mr. Boyer's testimony and must categorize his version of how the victim was injured as incredible. In addition, the only evidence supporting Mr. Boyer's assertion that he did not intend to kill Mrs. Blessinger is contained in his own statements, many of which are contradicted by his wife's testimony. The physical evidence at trial, especially the analysis of the victim's injuries, coupled with Mrs. Boyer's testimony, provides overwhelming evidence of Mr. Boyer's guilt. I conclude that the error in reading the Wisconsin instruction at Mr. Boyer's trial was harmless beyond a reasonable doubt.

It should be noted that part of the discussion of harmless error in *Austin* referred to the prosecutor's statements regarding intent in his closing argument. The trial transcript filed by the respondents in the case at bar does not contain a transcript of either side's closing arguments at Mr. Boyer's trial. Accordingly, in a letter dated May 13, 1981, I requested the respondents to submit such a transcript. In a letter dated June 2, 1981, counsel for the respondents stated that no record of the closing arguments was made at Mr. Boyer's trial, apparently because no one requested that such a record be made. *See* Wis.Stat. § 757.55(3). The lack of such a record makes evaluation of the closing arguments impossible, and I decline to speculate on what may have been said to the jury by either attorney.

## CONCLUSION

Therefore, IT IS ORDERED that the petition of Guy John Boyer for a writ of habeas corpus be and hereby is denied.

IT IS ALSO ORDERED that this action be and hereby is dismissed.